IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| STEVEN DONNELLE CODY | | PLAINTIFF |
| v. | Civil No. 6:09-cv-06016 | |
| MS. JACUELINE NEWBORN, Jail Administrator, Clark County Detention Center; TIM PATTERSON, Chief Deputy; RICK LOY, Interim, Jail Administrator, Clark County Detention Center; and DAVID TURNER, Sheriff, Clark County | | DEFENDANTS |
| STEVEN D. CODY | | PLAINTIFF |
| v. | Civil No. 6:09-cv-06026 | |
| JAQUEINE NEWBORN, Jail Administrator, Clark County Detention Center; TIM PATTERSON, Chief Deputy, Clark County Detention Center; RICK LOY, Jail Administrator, Clark County Detention Center; DAVID TURNER, Sheriff, Clark County; and OFFICER MOORE | | DEFENDANTS |
| STEVEN CODY | | PLAINTIFF |
| v. | Civil No. 6:10-cv-06014 | |
| RICK LOY, Jail Administrator; RAY WINSFIELD, Chief Deputy; RAYMOND MOORE, Jailer | | DEFENDANTS |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff filed these civil rights actions pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*. These actions were consolidated by order entered on September 26, 2011 (ECF No. 79 in Civil No. 6:09-cv-06016).

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Robert T. Dawson, United States District Judge, referred these cases to the undersigned for the purpose of making a report and recommendation. An evidentiary hearing was held on February 15, 2012. The cases are now ready for decision.

Plaintiff is currently incarcerated in the Maximum Security Unit of the Arkansas Department of Correction located in Tucker, Arkansas. The events at issue in this case occurred while he was incarcerated in the Clark County Detention Center (CCDC) from March 20, 2008, until July 27, 2009. Specifically, Plaintiff maintains that he was subjected to unconstitutional conditions of confinement at the CCDC and that Defendants failed to protect him from attack by a fellow inmate.

**1. Background and Evidence Presented**

At the evidentiary hearing, the testimony of the following witnesses was heard: (1) Former Sheriff David Turner; (2) Rick Loy; (3) Justin Moss; (4) Michael Arnett; (5) Jackie Newborn; (6) Reverend Johnny Harris; (7)Thomas Elps; (8) Chance Rutherford; (9) Ray Winsfield; (10) Chad Prince; and (11) Steven Cody. Two other witnesses were called, Larry Wilson and Trent Thomas, however they had no personal knowledge regarding the events at issue in this case and were excused without providing any substantive testimony. Two of the Defendants, Tim Patterson and Ray Moore, although notified of the hearing, did not appear.[1] For purposes of discussion, the testimony of the witnesses will be briefly summarized.

**Former Sheriff David Turner**

Former Sheriff Turner testified that at all times relevant to this case he was the Clark County Sheriff and in that position was ultimately responsible for the care of county prisoners. The jail had

---

[1] While Defendants Patterson and Moore did not appear for the hearing, they were not in default in this matter.

a number of problems over the years including jailers bringing contraband into the jail and failing to follow jail procedures. When he learned of the incidents, Sheriff Turner indicated he addressed the situation. A total of three jailers brought contraband into the facility, two were criminally prosecuted, and the third jailer resigned.

Efforts were made to curtail contraband getting into the jail including putting metal on both the inside and outside of windows. Outside a chain link fence with barbed wire on top was installed to prevent contraband from coming into the facility. Outside cameras were also installed in an effort to catch people trying to smuggle contraband into the facility.

Sheriff Turner vaguely recalled having a conversation with Cody that was recorded. Jail conditions and inmates bringing contraband into the jail were discussed. Sheriff Turner mainly recalled advising Cody that he, as an inmate, was not going to run the jail. Following the conservation with Cody, a "shake down" (search of all or part of the jail premises) was conducted. Sheriff Turner indicated shake downs occurred approximately once a week.

Sheriff Turner testified that the jail was an older facility and had been built in 1986. All paint that was used in the jail was latex and there was no lead based paint in the facility. As a result of the age of the facility, various aspects of the jail were in constant need of repair. Sheriff Turner was aware of there being mildew in the shower.

Problems with the plumbing occurred on a regular basis. In fact, he testified that something was wrong nearly every day. Three different plumbing companies did repair work at the jail. *See Defendants' Exhibit* (*Defts' Ex.*) 6. Sheriff Turner testified a plumber would usually be at the jail within two to three hours of having been called. There were times a cell could not be used because parts needed to be ordered to repair the plumbing.

Overcrowding of the facility was an every day thing. The jail had a maximum capacity of 45 inmates but with the drunk tank 51 people could legally be held. The jail population averaged forty-seven to fifty-two. To avoid overcrowding, Clark County housed some inmates in other jails. However, the facility was over capacity at times when detainees had to be brought back to Clark County for court. When this occurred, inmates would be placed on the floor for a maximum of a day or two.

In March of 2009, Sheriff Turner testified there was a fire at the jail. A detainee set fire in C-block and the inmates were evacuated.

**Rick Loy**

Loy testified he had worked for Clark County for almost four years; first in the capacity of a jailer and then as jail administrator. Loy testified the jail had problems with contraband coming in and with fights between the inmates. If it smelled of smoke, a shake down was performed. If contraband was found in the jail, it was removed and turned over the criminal investigation division (CID). Loy indicated that Cody had been caught with contraband including razor blades.

While there were problems at the jail, Loy indicated attempts were always made to resolve any issues that arose. The showers are located in the cell blocks. Loy testified he never saw, nor was he aware of there being, any mold in the shower area. However, he testified there was mildew.

Loy testified Cody never reported being shocked by the wires from the light. According to Loy, the ceilings in the jail are nine to ten feet high. *See e.g., Defts' Ex.* 18. The light fixtures in the cells were located at the very top of the wall against the ceiling. Loy testified the wires never hung down far enough to be reached.

At one point, Loy was aware there had been some foreign particles found in the food. Loy testified that this problem was resolved.

Loy was aware of the March 2009 fire but learned of it only after the fact. According to Loy, the fire started at about 10:00 or 10:30 p.m. but he did not learn of it until approximately 3:30 a.m. the following morning.

On July 18, 2009, Cody came to Loy and asked for Chance Rutherford to be moved. Cody did not tell him about any specific problems. Instead, Cody just said he was afraid there might be an altercation between the two of them. Loy indicates he offered to segregate Cody by locking him down in his cell. Cody refused. At the time, Loy indicated there was no other cell block he could have put Cody in because Cody had reported problems with many other inmates. Loy testified that every cell block had cells that could be locked down.

**Justin Moss**

Moss was employed as a jailer from April of 2009 until October of 2009. His duties included processing detainees, distributing meals, handing out medication, escorting detainees to court and any other activity involved in the care and custody of detainees.

When Moss searched prisoners he testified he often found cigarettes and on occasion found marijuana. The jail had problems with inmates damaging jail property including the lights. These were frequently damaged and had to be repaired.

There was a padded cell in A-block that was used for suicidal inmates and for inmates who needed to be segregated from others. If detainees got into fights, they were separated. According to Moss, Cody tended to aggravate other inmates.

**Michael Arnett**

Arnett is currently an ADC inmate but was in the CCDC from October 28, 2006, until September 3, 2009. While housed in the CCDC, Arnett had issues with medical care, discrimination, not being provided responses to grievances, and not getting opportunities for outside exercise.

Arnett indicates he was confined to his cell on one occasion for twenty some days and on another occasion for thirteen plus days without outside exercise and without being provided cleaning supplies. Each morning a mop and bucket was passed from cell to cell without the water being changed. Arnett indicated they were not provided with cleaning solution or bleach to put in the water. Although he conceded, it was possible cleaner and bleach had been added to the water before it was passed around.

He testified the showers had mold in them--mainly on the ceiling--there were plumbing problems, and no hot water. On multiple occasions, Arnett testified it took jail officials three days to a week to have the plumbing repaired. According to Arnett, some of the cells never had working plumbing. However, during the day, Arnett testified the restroom in another cell could be used. From about 10 p.m. to 5:00 or 6:00 a.m. inmates were locked in their cells. When he complained about jail conditions to Newborn, Arnett testified he was just told to go back to his cell.

Arnett testified that contraband was brought into the jail both by officers and inmates. The contraband included tobacco and cell phones. Some contraband was brought in by means of a hole in the window. Arnett heard rumors that Newborn was bringing contraband in. In fact, Arnett believed Newborn was terminated.

The cells were searched on a fairly regular basis. Additionally, more thorough searches were conducted on occasion.

5

Arnett was involved in one altercation that required him to have twenty-one stitches and four staples. He maintained the altercation was caused by other inmates.

Arnett was aware of one incident involving Rutherford. Rutherford was in the same cell block as Arnett and had been making threats all day. Arnett recalled Cody speaking with Loy, through a crack in the cell door, about being moved to a different pod because he might be assaulted. Arnett could not hear Loy's reply. This conversation occurred prior to the altercation between Cody and Rutherford. Arnett also recalled Cody speaking to Prince about this. Arnett recalled Cody saying he was scared of the outcome if Rutherford was put in the same pod.

According to Arnett, the altercation with Rutherford occurred within an hour of Rutherford being moved into the cell block. Arnett testified "everyone knew" that Cody and Rutherford did not get along. The two were involved in verbal altercations before the fight occurred.

During the altercation, Arnett testified eight to ten inmates were in Cody's cell. Arnett was at the door and all the inmates were "on top of" Cody.

Arnett was aware of the fact that inmates who got in trouble were placed in isolation in the padded room. Arnett recalled there being problems in C-block and believed his life would have been in danger if he was put back in that block.

While Newborn was the jail administrator, Arnett testified the food portions were small. When Loy became jail administrator, Arnett testified this was changed but not enough in his opinion.

With respect to the lights, Arnett testified that some were hanging directly from live wires. Arnett did not personally see any inmates destroying the light fixtures. Arnett indicates the lights were on the wall. He could stand on the floor and reach the bottom of the fixture. According to him, the wires were within the reach of a normal size male.

6

Arnett indicated nearly all the light fixtures were broken. Arnett was an electrician prior to his incarceration. While at the CCDC, he "rigged" the lighting so he could charge his cell phone.

### Jackie Newborn

Newborn testified she was employed at the CCDC for seven years. Initially she was a jailer and later because the jail administrator. As jail administrator, she over saw all aspects of detainee care. She was terminated but testified the Sheriff should be consulted for the reason for her termination.

To her knowledge, inmates caught with contraband were punished by either being put on lock-down or being criminally charged. Shake downs were done on a fairly regular basis. However, Newborn could not say the number of times inmates were found with contraband. While she was at the CCDC, Newborn testified no jailer brought contraband into the facility.

With respect to meals, Newborn testified they were prepared by the hospital and were to contain a certain caloric content. Newborn indicated each shift there was a female jailer on duty for women prisoners and a male jailer for men.

Newborn was aware of the fact that the intercom system was not working. This left inmates with no way to contact on duty staff. On occasion, she testified inmates would call the dispatch office using cell phones.

### Reverend Johnny Harris

Reverend Harris testified he is a pastor and school teacher. He knew Cody because he had stayed at Reverend Harris' house for approximately six months. During this time, Cody took the Reverend's car, without permission, and totaled it. The Reverend testified this was part of the reason Cody is in jail.

For approximately two years, Reverend Harris was the chaplain at the CCDC. He heard of the illegal activities going on there and saw one altercation between two inmates.

**Tommy Elps**

Elps is currently in the ADC. He first met Cody in 2007. During 2008, Elps testified that he and Cody discussed the incidents at Clark County. He recalled Cody being assaulted at Clark County and advising him to talk to Sheriff Turner about it. Elps could not recall Cody ever being aggravating or attempting to agitate others.

**Chance Rutherford**

Rutherford is an inmate in the ADC. On three different occasions, he has been incarcerated at the CCDC. His last incarceration there was from July of 2009 to November of 2009.

While he was at the CCDC, Rutherford stated he had medical problems. He testified he never alerted jail staff about any problems he was having with other inmates. Rutherford witnessed two inmates getting into a fight and the inmates being placed on lock-down. On other occasions, he testified inmates who had been involved in altercations were not separated.

According to Rutherford, Cody advised Loy and he and Rutherford were having a problem. Rutherford testified he had been housed in all barracks at the CCDC and there was no reason he could not have been moved to another cell block. Rutherford was angry with Cody because he believed Cody had alerted the Defendants to the fact that there was a cell phone in the pod. Rutherford also testified that Cody did tend to provoke and agitate others.

When Rutherford came into cell block B, he testified Cody was running around like he was the "top dog." Some of Rutherford's associates were scared and Rutherford decided to "take care of it." He went to Cody's cell and verbally and physically assaulted him. Rutherford testified he hit

Cody fifteen to twenty times and others from the cell block joined in. Rutherford referred to the fight as a complete "beat down." Prior to the fight, Rutherford testified he had not made any threats against Cody. After the altercation, Rutherford could not recall if he and Cody were placed on lock-down. Rutherford did recall, however, that within a day or two of the fight Cody was shipped to the ADC.

Shake downs at the jail occurred on a random but fairly regular basis. Rutherford testified that inmates caught with contraband suffered consequences. However, he indicated inmates smoked both tobacco and marijuana almost everyday. Rutherford witnessed contraband being brought into the jail and knew jailers were responsible for some of the contraband coming in.

Rutherford testified some of the cells had hanging lights with exposed wires. The shower area had green and black mold. He indicated the food was cold, the portions were small, and there were foreign particles in the food. Rutherford recalled Cody writing a grievances about the foreign particles.

### Ray Winsfield

Winsfield served two times as chief deputy at the CCDC. In 2009, he served as chief deputy from April 6, 2009, until September 30, 2009. As chief deputy, he oversaw the jail for the Sheriff. While he was chief deputy, Winsfield testified he was not aware of any illegal activity.

Winsfield was aware of a grievance Cody submitted complaining about being housed with detainee Robinson after the two had a verbal/physical altercation. *Plaintiff's Exhibit* (*Plff's Ex.*) D. On May 7, 2009, Winsfield talked to Cody but did not address the issue with regard to Robinson as the two were in different cells. *Id.*

9

Winsfield could not recall talking to Cody prior to his altercation with Rutherford. He was aware of the fact that Rutherford had thrown a deck of cards at Cody and others. According to Winsfield, both Rutherford and Cody had problems in almost every cell block they were housed in. After the two were involved in an altercation, the two were separated.

Winsfield testified Cody might have spoken to him about contraband in the jail. Winsfield testified the cell searches were done on a fairly regular basis. While Winsfield never allowed contraband into the jail, he indicated it did get in.

Winsfield was not aware of there being mold in the shower area on the ceiling. With respect to the fire in C-block, he was not present at the time and was not chief deputy at that time.

**Chad Prince**

Prince was a jailer at the CCDC for ten or eleven months in 2009. As jailer, his duties included giving medication, taking inmates to court, jail security, and yard call. When only one jailer was on each shift, he testified it was difficult to do yard call. If the jailer left the control booth, Prince testified there was no one in the jail area.

Prince was aware of problems with the light fixtures but testified the problems were caused by the inmates tearing the fixtures up. With respect to cleaning supplies, Prince testified that each morning a mop bucket was brought in containing cleaning solution and bleach mixed with the water.

Prince testified Cody and Rutherford had "words" but had not fought. Prince didn't recall if Cody talked to Loy about the situation but knew Cody was wanting to be moved. Prince was not on duty when the July 19th altercation took place but learned of it the following morning. When inmates were involved in altercations, Prince testified they were usually locked down but on one occasion he was aware of the inmates being placed in separate cell blocks.

With respect to contraband, Prince testified that if an inmate was caught with contraband he was charged with an offense. Officers who got caught bringing contraband in were disciplined in some manner.

**Steven Cody**

Cody was incarcerated at the CCDC from March 20, 2008, until July 27, 2009. According to Cody, inmates were frequently involved in altercations and Defendants failed to take any action in response.

Contraband was brought into the facility by both inmates and staff. Cody testified he advised the Defendants on a consistent basis about contraband being brought in. On several occasions, Cody asserts he told Sheriff Turner about specific inmates bringing contraband into the jail. Cody testified shakedowns were done once or twice a month but not on a regular basis. Cody testified that he advised Sheriff Turner about a variety of illegal activities and no action was taken. *See Defts' Ex.* 11.

With respect to Newborn, when something was brought to her attention Cody indicated she took action. Cody recalled bringing to her attention the hanging light fixtures, the faulty plumbing, cold food, and food with particles in it.

With respect to Loy, Cody testified that he did not address the issues brought to his attention. Instead, Cody likened Loy's response to a cover up.

Cody testified he was exposed constantly to tobacco smoke and marijuana in the air. He indicated the jail had bad plumbing. He stated there were occasions when feces remained in a toilet for four or five days. On one occasion, feces and urine remained in the toilet in Cody's cell for eight days. Attempts were made to flush the toilet by using buckets of water. While you could use the toilets in other cells, Cody testified that other inmates did not want to allow you to use their toilets.

11

On five or six different occasions, Cody testified he found hair or foreign objects in his food. When this occurred, Cody testified he could not eat the meal. One time, Cody testified no one was in the control booth to even tell about the situation.

Cody believed the tables had lead based paint. He indicates he based this belief on the fact that an exterminator who came to the jail said he thought the paint was lead based.

With respect to the exposed wiring from the light fixtures, Cody indicated the wires hung down next to the mirror. Cody received a shock and was "knocked back" one time. Defendants did fix the lights but they would be torn down again. Cody believed safety measures should have been taken so that the inmates could not get to the wiring.

When the fire occurred in C-block on March 6, 2009, at approximately 10:30 p.m., Cody indicated the jailer on duty was Ray Moore. Moore would not come into the cell block until another deputy arrived at the jail. Once another deputy arrived, they entered the cell-block and evacuated the inmates. The fire department brought in gas powered fans to clear the smoke at around mid-night. In Cody's opinion, the fans created more fumes than they eliminated because the motors were gasoline.

With respect to a possible assault or altercation with Rutherford, Cody testified Rutherford came into the cell block at approximately 10:00 a.m. on July 19, 2009. Loy would have been at the jail until approximately 4:30 p.m. The altercation occurred sometime after 7:00 p.m. that night. Cody had two teeth broken during the altercation and continues to have problems with his mouth.

Prior to the altercation, Cody testified he spoke to Loy through the door and was told he would have to consult Winsfield. According to Cody, no offer was made to separate him from Rutherford. Prior to July 19th, Cody and Rutherford had only been involved in verbal altercations.

However, that day, Cody believed Rutherford would attack him because Rutherford believed Cody told Defendants there was a cell phone in the cell block. A few hours later, Rutherford started the physical altercation.

### 2. Discussion

As noted above, Cody maintains he was subjected to unconstitutional conditions of confinement and that Defendants failed to protect him from attack. Each claim will be addressed separately.

### (A) Unconstitutional Conditions of Confinement

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*,

501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Here, Cody alleges a variety of conditions violated his constitutional rights. However, when considered separately, or in totality, Cody failed to demonstrate that he suffered "extreme deprivations," meaning that he was denied the "minimal civilized measure of life's necessities." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)(internal quotation omitted).

With respect to the problems with the light fixtures, the testimony was undisputed that the lights and wires were located sufficiently high on the wall to virtually eliminate the possibility of accidental contact. Additionally, Cody conceded Defendants repaired the lights as needed only to find the lights were again torn down by inmates.

With respect to the plumbing problems, Cody indicated the facility had frequent plumbing problems including the toilet in his cell not flushing for several days at a time. However, the toilets could be flushed by using buckets of water and inmates had access to the facilities in other cells from 5:00 a.m. or 6:00 a.m. in the morning until approximately 10:00 p.m. at night. It was undisputed that

efforts were made to repair any plumbing problems, although at times, it took as long as a week to get necessary parts.

Next, Cody maintains he found foreign particles in his food on five or six occasions during his incarceration at the CCDC. These isolated incidents do not state a claim of constitutional dimension. *See e.g., Wishon v. Gammon*, 978 F.3d 446, 449 (8th Cir. 1992)("[P]risoners have a right to nutritionally adequate food; however, Wishon has presented no evidence that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food"); *Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985)("The fact that the food occasionally contains foreign objects . . . does not amount to a constitutional deprivation"); *Lunsford v. Reynolds*, 376 F. Supp. 526, 527 (W.D. Va. 1974)("The only contention concerning food which is detailed at all, is the inmates' complaint that their food frequently contains insects. Nevertheless, occasional incidents of a foreign object contained in food, while regrettable, does not present a question of constitutional proportion").

Prisoners are entitled to reasonably adequate opportunities to exercise. Cody has not shown that he was denied adequate exercise. He was locked down in his cell during only at night and made no showing that his cell and the other areas of the facility he had access to during the day contained insufficient space to allow him to exercise. *See e.g., Honsa v. Groose*, 80 F.3d 298, 306 (8th Cir. 1996)(three hours per week of out-of-cell exercise does not necessarily violate the Constitution); *Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986)(fifteen days of no out-of-cell exercise not cruel and unusual punishment); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(45 minute out-of-cell recreation time per week did not violate the Eighth Amendment rights of inmate in protective

custody). No evidence was introduced suggesting Cody's health suffered due to a lack of exercise.

### (B) Failure to Protect

"The Eighth Amendment requires officials to provide humane conditions of confinement by taking reasonable steps to protect inmates . . . from assault by other inmates." *Schoelch v. Mithcell*, 625 F.3d 1041, 1046 (8th Cir. 2010)(comparable duty to protect exists from both pretrial detainees and convicted inmates)(internal quotation marks and citation omitted). To prove a failure to protect claim, Cody must show: "(1) an objectively, sufficiently serious deprivation, meaning that he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that the defendant was deliberately indifferent to the substantial risk of serious harm."  *Id.* (internal quotation marks and citation omitted). The subjective component encompassed in the second requirement is satisfied if the defendant is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.*

It has noted that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Pagels v. Morrison*, 335 F.3d 736, 740-41 (8th Cir. 2003)(internal quotation marks and citation omitted). In *Perkins v. Grimes*, 161 F.3d 1127 (8th Cir. 1998), the district court "agreed that defendants were on notice that Wilson was a disruptive inmate," but found defendants "had no notice that Wilson posed a threat of serious injury to Perkins because Perkins did not effectively alert them that he faced such a threat." *Id.* at 1130.

In this case, both Cody and Rutherford were regarded as being disruptive inmates. "An inmate's history of violence alone is insufficient to impute to prison officials subjective knowledge of the inmate's danger to harm other inmates." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011).

Of the Defendants, Cody only spoke to Loy about a potential for problems between the two inmates. Even then, Loy was not given any specifics. The facts did not put the Defendants on notice that Rutherford presented a substantial risk of harm to inmates in general, or to Cody personally, such that Defendants should have foreseen the attack on Cody. *Norman v. Schuetzle*, 585 F.3d 1097, 1105 (8th Cir. 2009). Further, I credit Loy's testimony that his offer to segregate Cody by locking him in his cell was rejected by Cody.

### 3. Conclusion

I therefore recommend that judgment be entered in the Defendants' favor and these cases be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 29th day of February 2012.**

                                                            /s/ Barry A. Bryant
                                                            HON. BARRY A. BRYANT
                                                            UNITED STATES MAGISTRATE JUDGE